# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

YENEISY R. DELGADO,       )
        Plaintiff,         )
                      )
     v.                 )        CASE NO.: 3:12-CV-53 JVB
                      )
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security,[1]  )
        Defendant.       )

## OPINION AND ORDER

Plaintiff Yeneisy Delgado seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a). Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, or in the alternative, remand the decision for further proceedings. For the following reasons, the Court grants Plaintiff's request for remand.

### A. Procedural Background

On July 28, 2008, Plaintiff applied for DIB and SSI alleging that she became disabled on March 14, 2008, due to cerebral palsy, depression, bipolar disorder, and back problems. (R. 14, 82, 161-65.) Plaintiff's concurrent applications were initially denied on January 27, 2009, as was her request for reconsideration on September 23, 2009. (R. 79-82, 83-86, 96-98, 103-05.)

On December 7, 2010, Administrative Law Judge ("ALJ") Roxanne Kelsey held a video hearing at which Plaintiff and a vocational expert testified. (R. 36-63.) On January 14, 2011, the

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically substituted for Michael J. Astrue as the named Defendant.

ALJ issued a decision finding Plaintiff not disabled and denying her claims for DIB and SSI.  (R.

12-30.)  In denying Plaintiff's claims, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.

2.  The claimant has not engaged in substantial gainful activity since March 14, 2008, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: generalized anxiety; depression; lumbar spondylosis and a L5 fracture; cerebral palsy; pseudo-seizures; and a histrionic personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record . . . the claimant has the following residual functional capacity:  She can perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with occasional climbing, balancing, stooping, kneeling, crouching, or crawling; simple routine tasks; no exposure to unprotected heights or dangerous moving machinery; and no more than occasional interaction with supervisors, coworkers or the public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August 3, 1982 and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

2

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 14, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

*Id.*

On November 22, 2011, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 1-3.)  Plaintiff now requests judicial review of the ALJ's January 14, 2011, decision denying her DIB and SSI claims.

**B.  Factual Background**

**(1) *Plaintiff's Background***

Plaintiff was born on August 3, 1982, and was 28 years old when the ALJ issued her decision.  (R. 28, 41.)  She graduated from high school education, earned an associate degree in medical office administration, and held several brief jobs in retail establishments.  (R. 28, 41, 457.)

**(2) *Overview of Medical Evidence***

Plaintiff suffers from a number of physical and mental impairments.  She was born with cerebral palsy and has a history of bilateral pars interarticularis defect (fracture) at the L5 disc level of her spine, which causes significant lower back and leg pain.  (R. 450.)  The record establishes that Plaintiff received treatment for her lower back pain in 2007 and 2008.  In March 2007, a CT of Plaintiff's lumbar spine indicated bilateral spondylolysis at the L5 disc level.  (R. 410.)  A year later, in early March 2008, Dr. Ravi Kanakamedala, a pain management specialist, evaluated Plaintiff and noted mild tenderness on palpation in the spinous processes and decreased external rotation and lateral flexion of the spine.  (R. 374-75.)  He diagnosed Plaintiff with L5 radiculopathy and lumbar

3

disc disease, and recommended she undergo a bilateral L5 epidural steroid injection because an earlier injection provided her with some pain relief.  *Id.*

In late March 2008, Dr. John Perez, an internist, assessed Plaintiff's lower back pain.  (R. 367-69.)  At that time, Plaintiff reported having throbbing lower back pain for two years, which radiated to her shoulders and caused her lower legs to go numb.  (R. 367.)  She told Dr. Perez that a number of prescription pain medications, including Darvocet, Vicodin, Lidocaine patches, and steroid epidural injections, did not relieve her pain.  *Id.*  Plaintiff described having difficulty walking and getting out of bed, being unable to sit for longer than 20 minutes at a time, and lying on her side to help alleviate the pain.  *Id.*  Dr. Perez noted muscle tenderness along Plaintiff's spine and prescribed new pain medication.  (R. 369.)

In August 2008, Dr. Perez treated Plaintiff for complaints of severe back pain.  (R. 346.)  Dr. Perez's physical examination of Plaintiff indicated there was tenderness over the sacroiliac joint and she "[could] not even stand up . . . much less lie down" during the examination.  *Id.*  He prescribed a walker and pain medication, and referred Plaintiff for a surgical consultation.  *Id.*  Several weeks later, Dr. Dwight Tyndall, a spine care specialist, recommended Plaintiff undergo L5-S1 spinal fusion surgery with instrumentation.  (R. 443, 444.)

In November 2008, Dr. Ikechukwu Emereuwaonu, a licensed physician for the Social Security Administration's Disability Determination Bureau ("DDB"), conducted a consultative evaluation of Plaintiff.  (R. 450-54.)  She reported having lower back pain, which radiated to her legs and caused tingling and numbness.  (R. 450.)  Her pain was exacerbated by walking and standing for 15 minutes at a time, but her pain was relieved by lying down and taking medication.  *Id.*  Plaintiff explained she is unsteady on her feet, fell down about six times that year, and hunches over

4

because of her pain.  *Id.*  A physical examination indicated Plaintiff was unsteady when walking without an assistive device and had difficulty tandem walking and squatting.  (R. 453.)  Dr. Emereuwaonu assessed Plaintiff as having intention tremor and past-pointing with the left hand being worse than the right hand, and lower back pain with sciatica.  *Id.*

A month later, in early December 2008, Dr. Carl Hale, Psy.D., a licensed clinical psychologist for the DDB, performed a psychological evaluation of Plaintiff.  (R. 456-61.)  She reported having difficulty sleeping and making decisions, feeling sad, hopeless, fearful, apprehensive, tearful and worried, and being hospitalized after a suicide attempt.  (R. 457.)  Plaintiff explained she had a history of seizures, which began after she fell on the ice and hit her head.  *Id.*  Dr. Hale's mental status examination indicated Plaintiff was unable to perform a serial sevens test and displayed mild to moderate psychomotor slowing interspersed with restlessness.  (R. 458-59.)  During the evaluation, Plaintiff appeared to have a seizure because she suddenly became unresponsive and exhibited tonic clonic movements in her head and upper extremities lasting about 15 seconds.  (R. 459.)  After the episode, however, she was oriented to place.  *Id.*  Dr. Hale noted there was no indication Plaintiff was malingering during the evaluation.  (R. 460.)  He diagnosed Plaintiff with major depression, generalized anxiety disorder, and a Global Assessment of Functioning ("GAF") score of 49.[2]  (R. 460-61.)

In mid-December 2008, Plaintiff was hospitalized because she was shaking, particularly in her left arm.  (R. 462.)  She was assessed with having a grand mal seizure with an unknown etiology.

---

[2]  The GAF includes a scale ranging from zero to 100, and is a measure of an individual's "psychological, social, and occupational functioning."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Tex. Rev. 2000) ("DSM–IV–TR").  A GAF score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.

(R. 466, 472.)  Plaintiff was prescribed Dilantin (seizure medication), Ativan and Valium (anxiety medication), and a CT scan of the head was unremarkable.  (R. 462, 463, 466, 472.)  Hospital notes indicate Plaintiff continued to experience seizures in the hospital and the attending physician suspected Plaintiff was having pseudoseizures.  (R. 18, 469.)

In January 2009, Dr. Stacia Hill, Ph.D., a state agency consultant, reviewed Plaintiff's medical file and assessed her mental ability to perform work-related activities.  (R. 483-500.)  She diagnosed Plaintiff with recurrent, severe major depression and generalized anxiety disorder.  (R. 486, 488.)  Dr. Hill opined Plaintiff could not complete complex tasks, but she could perform repetitive tasks on a sustained basis.  (R. 499.)  She assessed Plaintiff as having moderate difficulties in maintaining concentration, persistence, or pace, and being moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods.  (R. 493, 497.)  Dr. J. Sands next reviewed Plaintiff's medical record and completed a Physical Residual Functional Capacity ("RFC") Assessment form. (R. 501-08.)  He opined Plaintiff is limited to performing less than the full range of light work because of certain postural limitations.  (R. 502-03.)

A month later, in February 2009, Plaintiff sought emergency medical treatment on a number of occasions for seizures.  (R. 917, 931, 938, 960.)  She was assessed with having a history of non-epileptic seizures, which were brought on by stress.  (R. 934.)  Plaintiff was prescribed Dilantin, Depakote (seizure medication), Celebrex (nonsteroidal anti-inflammatory medication), Lovenox (blood clot medication), and Ativan.  (R. 936.)  During another emergency room visit that month, Plaintiff explained she could not help her seizures because they "just come on."  (R. 919.)  Hospital notes reflect that the shaking of Plaintiff's upper extremities "appear[ed] voluntary" because, if

asked, she was "able to hold one arm still." *Id.* At one point, Plaintiff was sent home from one hospital because staff believed she was faking her seizure symptoms. *Id.* Dr. Adnan Arif, an attending psychiatrist, diagnosed Plaintiff with a non-epileptic seizure somatoform disorder, a histrionic personality disorder (excessive emotional and attention seeking behavior), and a GAF score of 55.[3] (R. 934.)

In March and April 2009, Plaintiff continued to be treated for complaints of seizures. Hospital notes from March indicate Plaintiff was alert talking with staff while she had jerking movements to all of her extremities, but she was able to hold still while she was given intravenous medication. (R. 901.) She reported to hospital staff that her physicians wanted to place her in a nursing home because she was unable to take care of herself and fell frequently. (R. 904, 908.) Plaintiff was diagnosed with pseudoseizures. (R. 908, 910.) Then, in early April, Plaintiff sought emergency medical treatment after having three seizures in one day and was diagnosed with recurrent seizures. (R. 888-91.)

Toward the end of April 2009, hospital notes indicate Plaintiff was actively seizing and having full body seizures. (R. 515-20, 523-25.) She underwent video monitoring and was diagnosed with pseudoseizures. (R. 515.) Plaintiff was referred for an in-patient psychiatric consultation and, at the time of her evaluation, Dr. Ari's notes indicate Plaintiff was lying in bed, writhing in acute pain, tearful, and yelling loudly. (R. 515-16, 519.) After she was given Ativan, Plaintiff cooperated and explained she is often anxious, depressed, and dramatic. (R. 519.) Dr. Ari assessed Plaintiff as more likely having severe anxiety panic attacks rather than seizures. (R. 519-

---

[3] A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

20.)  He recommended Plaintiff avoid narcotic medications due to her past drug addiction and follow-up with outpatient care because she had a "repeated pattern of presenting to hospitals with this sort of dramatic presentation." (R. 520.) Dr. Ari diagnosed Plaintiff with mood, conversion and histrionic personality disorders, and a GAF score of 55.  *Id.*

In May and June 2009, Plaintiff was treated for involuntary shaking and seizures and was diagnosed with non-epileptic seizures, tremors, and anxiety.  (R. 560, 880, 883.)  She fell down in the emergency room, but was able to answer questions while shaking uncontrollably.  (R. 881.)  In early June, Plaintiff was able to talk to hospital staff while shaking and stopped shaking when she was given intravenous medication.  (R. 858.)  A hospital note indicates that when a nurse entered her room, Plaintiff appeared to be resting comfortably, but when she noticed the nurse she started shaking.  (R. 870.)  She was diagnosed with pseudoseizures and a histrionic personality.  (R. 854, 856, 858, 859, 863, 866.)  At the end of June, Plaintiff had a 15-minute long tonic clonic seizure. (R. 672.)  While hospitalized, she appeared to have a seizure localized to the upper extremities, but she was still able to talk to the attending physician during the seizure.  (R. 688.)  A CT scan of the head and an electroencephalogram produced normal results.  (R. 695, 697, 716.)

A month later, in July 2009, Plaintiff was treated for shaking episodes and seizures lasting 15 minutes in duration.  (R. 613, 637.)  Diagnostic testing showed Plaintiff was having non-epileptic psychogenic seizures.  (R. 614, 620.)  The attending physician also assessed Plaintiff as having a number of psychosocial stressors and diagnosed a mood disorder.  *Id.*  He prescribed Depakote, Paxil (depression and anxiety medication), and Trazodone (depression medication).  (R. 614.) Hospital notes indicate Plaintiff was homeless and recently loss custody of her children.  (R. 624, 626.)  While hospitalized, Plaintiff insisted physicians at other hospitals had prescribed Xanax

(anxiety medication) for her seizures, but the attending physician opined that Plaintiff's "seizure-like movements [were] malingering in nature." (R. 626.)

At the end of July 2009, Plaintiff was hospitalized because she had suicidal thoughts. (R. 564.) After admission, Plaintiff denied suicidal ideation and admitted to stealing from her parents and having considerable domestic problems. *Id.* Several weeks later, during a follow-up evaluation with Dr. Christopher Shahzaad, a psychiatrist, Plaintiff reported she was doing better, but she still felt anxious. *Id.* At that time, she requested another Ativan prescription even though she had recently filled one for 90 pills and could not account for why there was no medication left. *Id.* Her mother explained Plaintiff had a history of abusing her medications, including Xanax and benzodiazepines (Ativan). *Id.* On mental status examination, Dr. Shahzaad noted Plaintiff was "tearful, labile, and focused on getting Ativan." (R. 565.) He assessed Plaintiff as being "extremely manipulative" and having a "history of being manipulative in order to get access to medications." *Id.* In particular, Dr. Shahzaad opined Plaintiff is "extremely medication seeking for Xanax and Ativan." *Id.*

In early November 2009, Plaintiff sought emergency medical treatment for tonic clonic type seizure activity. (R. 580.) The seizure was witnessed by staff living at Plaintiff's shelter. *Id.* She was transported to the hospital and given intravenous Dilantin and Ativan. (R. 582.) Plaintiff was diagnosed with an adjustment disorder with mixed emotional seizures, sedative hypnotic dependence, and a GAF score of 70.[4] (R. 587.)

From July through September 2010, Plaintiff continued to seek treatment for complaints of seizures. In July, Plaintiff was diagnosed with generalized convulsive epilepsy and, in August,

_____

[4] A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

Plaintiff appeared to have a seizure, but she was still able to talk to hospital staff during the seizure. (R. 740, 841, 846.)  A CT scan of the head produced normal results and a hand evaluation indicated occasional tremors with contractures.  (R. 742, 844, 853.)  Then, in early September 2010, Plaintiff had occasional seizures while in the emergency room, but she was fully awake and moved all of her limbs, including her head and neck, in a seizure-like action.  (R. 809, 814.)  At the time, Plaintiff claimed she was not "faking" and her seizure activity was, in fact, real.  (R. 814.)

In mid-September 2010, Plaintiff was transported to the hospital in a lethargic state.  (R. 786.)  While hospitalized, Plaintiff began to have a pseudoseizure, but after being given an intravenous saline flush, she stopped shaking and was able to talk with hospital staff.  *Id.*  She then pulled a "script" out of her purse, which had been written by Dr. Karl Kirby, a family practice physician, stating she has "real seizures."  *Id.*  At the end of September, Plaintiff saw Dr. Gerri Browning, a family practice physician, for a follow-up evaluation of her seizures.  (R. 745-46.)  Dr. Browning noted Plaintiff had a pronounced rigid movement of her bilateral upper and lower extremities when she looked directly at Plaintiff.  *Id.*  Dr. Browning declined to refill Plaintiff's medications because she had a history of drug abuse and notified the Bureau of Motor Vehicles that Plaintiff could no longer drive.  (R. 746.)  Additionally, in a September 27, 2010 letter, Dr. Kirby opined Plaintiff suffered from infantile cerebral palsy and generalized convulsive epilepsy, and took a number of medications for these disorders.  (R. 964.)

In October and November 2010, Plaintiff was hospitalized for dizziness and seizures.  (R. 749, 751, 759, 762.)  During this period, Plaintiff reported lower back, leg, and arm pain and requested Dr. Kirby complete disability forms because her medication caused her to feel drowsy. (R. 752, 968.)  At the end of November, Dr. Christen Morrow, a family practice physician, noted

10

Plaintiff had a left leg sprain after being involved in a car accident.  (R. 970.)  Plaintiff, however, had a full range of motion and was prescribed Vicodin, Klonopin (panic disorder medication), and Ativan.  (R. 970-71.)

### (3) *Plaintiff's Testimony*

Plaintiff testified she has an associate degree in medical office administration and previously worked at two retail establishments.  (R. 41.)  She was never able to work in the medical field because after graduating from high school she began having seizures.  *Id.*  Plaintiff lost her retail jobs because she had seizures at work and her bipolar disorder caused her to cry a lot and impacted her ability to remember things.  (R. 41-42.)

Plaintiff explained that on a good day, similar to the day of the hearing, she does not shake a lot.  (R. 42.)  Plaintiff's physical condition that day was "somewhat spastic" because her "right hand [was] shaking pretty considerably" and "sometimes [her] head shakes as well as [her] left hand."[5]  (R. 43.)  She typically shakes this much each day and this degree of shaking began about a year earlier.  *Id.*  Plaintiff explained nothing helps to stop or calm her shaking.  (R. 45-46.)  She often wakes up at night shaking and her legs also hurt.  (R. 47.)  Plaintiff rated her pain as a "10" on a scale of one to 10 because her shaking makes her arms, legs, back, and neck painful.  (R. 48-49.) She took Dilantin, but she did not take pain medication even though she is in pain the majority of each day.  (R. 49.)

Plaintiff next described how her seizures limit her daily activities.  She is no longer able to drive and cannot take a bus or train because she has three seizures a day.  (R. 44-45.)  On a typical day, Plaintiff lies on her side and watches television and movies.  (R. 46.)  She is not able to cook

---

[5] Because the administrative hearing was conducted by video, Plaintiff's attorney described Plaintiff's physical condition to the ALJ.  (R. 42.)

11

because her shaking causes her to burn herself but she can use a microwave.  (R. 47.)  Plaintiff lives with a friend and can grocery shop with her, but Plaintiff must sit down when shopping because she gets tired.  (R. 45, 47.)  She has a "network of friends and family" who assist her with daily activities, which include dressing, bathing, housework, and caring for her children.[6]  (R. 259.)  Plaintiff is only able to leave the house once a week and does not visit with others.  (R. 48.)

Plaintiff explained she is not able to see a physician or purchase her medications at times because she does not have Medicaid and cannot afford the co-payment.  (R. 45, 56.)  When she is able to afford medication, she has a number of side effects from the medication, which include vomiting and difficulty urinating.  (R. 45.)  Plaintiff did not pursue a recommendation that she undergo back surgery because she was scared about having the surgery.  (R. 46.)  She also explained she has bipolar disorder and, as a result, she is always sad.  *Id.*  Plaintiff further described having hand tremors and muscle spasms that were so severe at times that her fingers would lock into a fist and turn blue due to a lack of circulation and she would often need to have her fingers pried open, which was very painful.[7]  (R. 259.)

Regarding her physical limitations, Plaintiff can lift and carry five pounds, sit for 15 to 20 minutes, and walk about half a block because her legs shake and it is "hard [for her] to walk straight . . . if they start shaking."  (R. 49-50.)  She is not able to button her clothes or use a computer.  (R. 50.)  Plaintiff further explained she had not drank alcohol or used illegal drugs for a number of years. (R. 50-51.)

---

[6]  Plaintiff made this statement in a March 31, 2009 Disability Report to the Social Security Administration. (R. 259.)

[7]  Plaintiff made this statement in a March 31, 2009 Disability Report to the Social Security Administration. (R. 259.)

**(4)** *December 2008 Report*

In a December 2008 Adult Third Party Function Report, Plaintiff's mother explained Plaintiff was born with severe tremors and shook because she has nerve damage from cerebral palsy. (R. 241.)  As a result of her condition, Plaintiff required assistance in virtually all of her daily and life activities.  (R. 240-47.)  For example, Plaintiff needed to have someone close by when she bathed so she would not fall down in the bathtub and she had difficulty eating because her tremors prevented her from raising her hand to her mouth.  (R. 241.)  Plaintiff's tremors interfered with her carrying hot liquids, using sharp items, handling money, and brushing her hair.  (R. 241, 242, 244, 245.)  Plaintiff's mother described Plaintiff as being unsteady on her feet, which required her to use a cane or walker.  (R. 242, 243, 246.)  She also could not bend, reach, lift, sit or walk for very long because of her back pain and must lie on her side to relieve the pain.  (R. 244-45.)  Furthermore, Plaintiff's mother estimated Plaintiff could walk less one block before she would need to stop and rest for about five minutes.  (R. 245.)

Plaintiff's mother reported Plaintiff would sometimes have four or five seizures in a day and they occurred without any warning.  (R. 248.)  She explained that when Plaintiff has a seizure she is unable to talk and, after it subsides, she stares.  *Id.*  The seizures, which occur from the waist up, cause stiffness and pain in Plaintiff's arms and hands, and her hands are curled up after the seizure. *Id.*  Plaintiff typically sleeps for 10 to 15 minutes after a seizure and, about an hour and a half later, she is able to resume some activities and talk again.  (R. 249.)  At times, Plaintiff must be hospitalized because of the seizures.  *Id.*

13

**(5) *Vocational Expert's Testimony***

Richard Fisher, a vocational expert, testified at the administrative hearing. Fisher characterized Plaintiff's past work as a cashier, collection clerk, data entry clerk, and credit clerk as constituting sedentary or light level work. (R. 58.) The ALJ posed two hypothetical questions to Fisher to determine if there were any jobs in the regional economy Plaintiff could perform. (R. 58-60.) The first hypothetical required Fisher to assume an individual with Plaintiff's vocational profile and prior work experience who was able to perform light work, but who could only occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 58-59.) This hypothetical individual could not be exposed to unprotected heights or dangerous moving machinery, and was limited to simple repetitive tasks. (R. 59.) Based on these limitations, Fisher stated Plaintiff could perform her past work as a cashier and she could also perform light work as a marker, routing clerk, and survey worker. *Id.* The ALJ then posed a second hypothetical to Fisher in which she asked him to assume an individual similar to the one in the first hypothetical, but that individual could have no more than occasional interaction with supervisors, coworkers, or the public. *Id.* In response to the second hypothetical, Fisher stated Plaintiff could still perform the marker and routing clerk jobs, but not the survey worker job. *Id.* He also testified that Plaintiff would be able to perform a mail clerk job. (R. 59-60.) Furthermore, when questioned by Plaintiff's attorney, Fisher stated that if an individual had unpredictable pseudoseizures that took her off task for more than 15 or 20 minutes at a time then there would be no work available for her.[8] (R. 61-62.)

---

[8] Toward the end of the hearing, Plaintiff appeared to have a seizure. (R. 60-61.)

**C.  Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one: the Court must affirm the decision if it is supported by substantial evidence.  42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration.  *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  Where conflicting evidence would allow reasonable minds to differ as to whether a plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts.  *Id.*  Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, and the error is not harmless, the Court must reverse the decision regardless of the evidence supporting the factual findings.  *Id.*

While the standard of review is deferential, the Court "must do more than merely rubber stamp" the Commissioner's decision.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted).  In order for the Court to affirm a denial of benefits, the ALJ must have articulated the reasons for the decision at "some minimal level."  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  This means that the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion."  *Id.*  Although an ALJ need not address every piece of evidence, the ALJ cannot limit her decision to only that evidence which supports her ultimate conclusion.  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ's decision must allow the Court to assess the validity of her findings and afford the plaintiff meaningful judicial review.  *Scott*, 297 F.3d at 595.

**D.  Five-Step Inquiry**

To qualify for DIB and SSI under Titles II and XVI, a claimant must establish that she has a disability within the meaning of the Act.[9]  42 U.S.C. §§ 423(a)(1)(D),1382c(a).  An individual is "disabled" if she has an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007).  The Social Security Regulations set forth a five-step sequential inquiry for determining whether a claimant is disabled.  The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted).

An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled.  20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352.  A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled.  20 C.F.R. § 404.1520; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989).  The claimant bears the burden of proof through step four.  *Briscoe*, 425 F.3d at 352.  If the first four steps are met, the burden shifts to the Commissioner at step five.  *Id.*  The Commissioner must then establish that the claimant—in light of her age, education, job experience and RFC to

---

[9]  The regulations governing the determination of disability for DIB are set forth at 20 C.F.R. § 404.1501 *et seq.*  The SSI regulations, which are nearly identical to the DIB regulations, are found at 20 C.F.R. § 416.901 *et seq.*  Instead of referencing both sets of regulations, the Court shall rely on the DIB regulations.

16

work—is capable of performing other work and that such work exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

## E.  Analysis

Plaintiff challenges a number of aspects of the ALJ's decision.  She first argues that the ALJ erred in finding that her pseudoseizures did not meet a listed impairment.  Plaintiff next claims the ALJ's RFC finding was flawed because she did not properly (1) consider the functional limitations caused by her pseudoseizures, (2) account for her mental limitations in concentration, persistence, or pace, (3) assess her moderate limitations in social functioning; (4) evaluate her hand limitations, and (5) consider the combined impact of her impairments.  She also asserts the ALJ erred by crafting an RFC finding without the advice of a medical expert.  Plaintiff further contends the ALJ improperly assessed her credibility because she evaluated the credibility of her testimony after she developed the RFC finding, based her finding on her own personal observations at the hearing, and discredited her testimony for a number of unsupported reasons.  The Court now considers each of the asserted grounds for remand.

## (1) *Step Three Issue*

Plaintiff first argues that the ALJ failed to properly analyze whether her pseudoseizure disorder satisfied the requirements for Listings 11.02 and 11.03.  (Pl.'s Mem. at 7-9.)  She contends the ALJ's error is reversible because she did not minimally articulate her rationale for why she believed the evidence did not satisfy either listing.  *Id.* at 8.  The Commissioner defends the ALJ asserting Plaintiff has failed to identify medical evidence that establish her symptoms meet or medically equal the severity and durational requirements of the applicable listings.  (Def.'s Mem. at 5-6.)

At step three of the sequential evaluation, an ALJ must determine whether a claimant is conclusively disabled based on one of the Social Security Administration's listed impairments. 20 C.F.R. § 404.1520(d), 20 C.F.R. Pt. 404, Subpt. P, App. 1. Under the theory of presumptive disability, a claimant qualifies for benefits if she has an impairment or combination of impairments that meets or medically equals a listed impairment. *Id.* The ALJ found that Plaintiff's pseudoseizure disorder did not meet or equal the level of severity for any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 15.) The Seventh Circuit has described pseudoseizures as follows:

> Pseudoseizures, also know as psychogenic seizures, nonepileptic seizures, and paraoxysmal nonepileptic episodes (PNES), resemble epileptic seizures but are not attributable to epilepsy or abnormal electric activity in the brain. Ronald P. Lesser, *Treatment and Outcome of Psychogenic Nonepileptic Seizures, Epilepsy Currents,* Nov. 2003, at 198. No single cause of psychogenic seizures has been identified, but they are typically attributed to an underlying psychological disturbance. *Id.* Those who have been victims of physical or sexual abuse seem to be at greater risk for developing pseudoseizures. *Id.* Some symptoms of a pseudoseizure disorder can be treated with medication, but psychological therapy, not medication, appears to be the preferred course of treatment. *Id.*

*Boiles v. Barnhart*, 395 F.3d 421, 422 (7th Cir. 2005).

As stated, Plaintiff takes issue with the ALJ's analysis of her pseudoseizures under Listings 11.02 and 11.03. Listing 11.02 provides:

> Epilepsy—convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.
>
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
>
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02.  Listing 11.03 provides:

> Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.  With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

*Id.* § 11.03.

> Regarding the step three analysis, the ALJ stated:

> The claimant does not meet or medically equal listing 11.02, as there is no evidence of convulsive epilepsy occurring more frequently than once a month in spite of at least 3 months of prescribed treatment with daytime episodes or nocturnal episodes manifesting residuals, which interfered significantly with activity during the day. The claimant does not meet or medically equal 11.03, as there is no evidence of nonconvulsive epilepsy occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment, with alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

(R. 15.)  But here the ALJ's cursory analysis at step three fails to apprise this Court how she arrived at her conclusion because she simply reiterated the criteria of the listings and stated the criteria was not met.  The ALJ neither discussed the medical evidence nor explained how the evidence shows Plaintiff did not experience pseudoseizures more than once a month as required by Listing 11.02, or more frequently than once a week as required by Listing 11.03.  The record contains ample medical evidence establishing Plaintiff suffers from severe shaking episodes and chronic pseudoseizures.  (*See e.g.*, R. 459, 462, 469, 472, 515-20, 580, 613, 620, 672, 745-46, 809, 841, 854, 856, 880, 888-91, 908, 910, 917-18, 934, 960, 964.)  Additionally, Plaintiff's mother  reported to the Social Security Administration that Plaintiff sometimes has four or five seizures a day, but the ALJ did not discuss this report, which corroborated the nature and frequency of Plaintiff's pseudoseizures.  Furthermore, while the Court recognizes that the ALJ and some medical

professionals did not believe Plaintiff suffered from pseudoseizures and, she, in fact, "faked" her seizure symptoms, this Court's independent review of the record confirms that the record contains ample credible medical evidence substantiating Plaintiff's severe shaking and pseudoseizure episodes.

The Commissioner's defense of this aspect of the ALJ's decision relies on post hoc rationalizations. Here, the Commissioner argues that Plaintiff's pseudoseizures failed to satisfy Listing 11.02, because she did not lose consciousness during her shaking episodes and she was also coherent, logical, and oriented during those episodes. (Def.'s Mem. at 6.) The Commissioner further contends that Plaintiff experienced no residual effects from her pseudoseizures and she could stop shaking when asked to do so by medical professionals. *Id.* But here the ALJ never articulated these reasons in her step three analysis and the Court must confine its review to the reasons articulated by the ALJ. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (discussing Listing 11.03 and noting that "regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine [the court's] review to the reasons supplied by the ALJ"). Moreover, contrary to the Commissioner's contention that there is no evidence indicating Plaintiff experienced residual effects from her pseudoseizures, there were instances when Plaintiff was unresponsive, lacked awareness (postictal) and acted abnormally during her pseudoseizures episodes, and her episodes were severe enough to interfere with her activities. (*See e.g.*, R. 248-49, 275, 459, 470-71, 472, 515, 517, 529, 578, 594, 619, 739.)

Furthermore, in the context of her step three analysis, the ALJ never discussed whether Plaintiff was compliant with taking her prescription medication.  Under Listings 11.02 and 11.03, the ALJ was required to discuss whether Plaintiff experienced pseudoseizures "in spite of at least 3 months of prescribed treatment."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.02, 11.03.  Because the record contains evidence of Plaintiff's sporadic noncompliance with medication, the ALJ should have discussed what effect her noncompliance had on her pseudoseizure disorder.  (*See e.g.*, R. 45, 46, 515, 517.)  However, the Seventh Circuit has held that "evidence of noncompliance by itself proves nothing" and what matters is "whether the record contains evidence of a casual link between the noncompliance and the ongoing seizure episodes."  *Steele*, 290 F.3d at 941.  But the ALJ's discussion at step three falls short because she never explained whether there was a casual link between Plaintiff's noncompliance with taking prescribed medications and her pseudoseizures.

Based on these shortcomings, the Court remands the case to the ALJ to review the record evidence and address the issue of whether Plaintiff's pseudoseizures meet or medically equal Listings 11.02 and/or 11.03.  *Brindisi ex. rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir.2003) (finding that the "omission of any discussion of [plaintiff's] impairments in conjunction with the listings frustrates any attempt at judicial review"); *Scott*, 297 F.3d at 596 (remanding when the ALJ failed to minimally articulate the basis for finding plaintiff did not meet the listing).  On remand, the ALJ should also consider whether Plaintiff's pseudoseizures meet or medically equal any other listed impairment.  *Boiles*, 395 F.3d at 427 ("pseudoseizures may be more analogous to an impairment described in a listing other than 11.02, such as one that describes a psychological impairment").

**(2)** *Step Four Issue*

Plaintiff first contends that the ALJ's RFC finding is flawed because she failed to properly assess the functional limitations caused by her pseudoseizures and include those limitations in her finding.  (Pl.'s Mem. at 9-11.)   The Commissioner defends the ALJ asserting that she was not required to include limitations stemming from Plaintiff's pseudoseizures because there was no diagnostic evidence of "true seizure activity," Plaintiff remained alert, oriented and logical during her pseudoseizures, and she appeared to be able to control her pseudoseizures.  (Def.'s Mem. at 7-8.)

At step four of the sequential evaluation, an ALJ must assess a claimant's RFC.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) ("The RFC is an assessment of what work-related activities the claimant can perform despite her limitations."); *see also* 20 C.F.R. § 404.1545(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence.  *See* 20 C.F.R. § 404.1545(a)(3). According to the regulations:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7.  Although an ALJ is not required to discuss every piece of evidence, she must consider all of the evidence that is relevant to the disability determination and provide enough analysis in her decision to permit meaningful judicial review.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Young*, 362 F.3d at 1002.  In other words, the ALJ must build an

22

"accurate and logical bridge from the evidence to [her] conclusion." *Scott*, 297 F.3d at 595 (citation omitted).

The ALJ's central error in assessing Plaintiff's RFC was her failure to reconcile how Plaintiff could maintain employment despite evidence of the frequency of her pseudoseizures. The record establishes that the frequency of Plaintiff's pseudoseizures (and related emergency room treatment) is incompatible with full-time employment. The ALJ's failure to consider the frequency of Plaintiff's pseudoseizures in her RFC analysis is particularly problematic in light of Fisher's testimony that if Plaintiff had unpredictable pseudoseizures, which took her off task for more than 15 or 20 minutes at a time, then there would be no work available for her. (R. 61-62.)

In assessing Plaintiff's pseudoseizures, the ALJ appears to have relied on her own personal belief that Plaintiff was "faking" her seizure symptoms despite observations by qualified medical professionals who witnessed multiple instances of seizure activity. (*See e.g.*, R. 469, 529, 591, 594, 687, 739, 888, 894.) As stated, while the Court recognizes, in some instances, medical professionals may not have believed Plaintiff was having a pseudoseizure, there are many reliable diagnoses of pseudoseizure disorder and prescription medication treatment in the record. Furthermore, the ALJ and those medical professionals, who doubted Plaintiff's pseudoseizure activity, may have had a fundamental misunderstanding of pseudoseizures:

> A seizure is a temporary loss of control that is often accompanied by convulsions, unconsciousness, or both. Most common are epileptic seizures, which are seizures caused by a sudden abnormal electrical discharge in the brain. Non-epileptic seizures, on the other hand, are not accompanied by abnormal electrical discharges and are therefore termed "pseudo" or "false" seizures. The term "pseudoseizures" is misleading, however. The seizures are quite real, and people who have them do not have conscious, voluntary control over them. They are "false" only in that they have no physical cause; rather, they are said to be psychogenic, or physical reactions to psychological stresses. Pseudoseizures resemble epileptic seizures, even though their causes are different. Pseudoseizures may be generalized convulsions (similar

> to "grand-mal" epileptic seizures) that are characterized by falling and shaking. Others are similar to the "petit mal" or "complex partial" epileptic seizures that are limited to temporary loss of attention, "staring into space," or "dozing off."

*See* http://hsc.usf.edu/com/epilepsy/PNES_CCF.html (Comprehensive Epilepsy Program Brochure published at The Cleveland Clinic Foundation, 1994, Selim R. Benbadis, M.D. and Susan J. Stagno, M.D.) (last visited May 17, 2013).  Given the nature of pseudoseizures and the possibility that several medical professionals improperly diagnosed Plaintiff as malingering or misrepresenting her symptoms, a remand on this issue is warranted.  *See* http://www.indianpediatrics.net/july2004/july-673-679.htm (Indian Pediatrics Review Article on Pseudoseizures, M.S. Bhatia, M.D.) (last visited May 21, 2013) ("Pseudoseizures are not only to be differentiated from various forms of epilepsy but also from disorders like malingering.").[10]

Plaintiff next argues that the ALJ's RFC finding is flawed because the ALJ's restriction to jobs requiring "simple, routine tasks" did not properly accommodate her moderate limitations in concentration, persistence, or pace.  (Pl.'s Mem. at 11-12.)  Plaintiff contends this restriction is insufficient because it does not automatically equate with accommodating a moderate limitation in concentration, persistence, or pace.  *Id.*  The Commissioner defends the ALJ stating she adequately accommodated Plaintiff's mental limitations by restricting her to simple, repetitive work that required only occasional contact with co-workers and the public.  (Def.'s Mem. at 8-9.)  The Commissioner further points out the ALJ was not required to include Plaintiff's moderate limitations in concentration, persistence, or pace in the RFC finding and instead was required to convert those limitations into functional limitations.  *Id.* at 9.

---

[10]   The Commissioner's argument that the ALJ was not required to consider limitations stemming from Plaintiff's pseudoseizures because there was no diagnostic evidence of "true seizure activity" is without merit as pseudoseizures are not accompanied by abnormal electrical charges.

The Court agrees with Plaintiff and finds that a restriction to simple, routine tasks does not fully account for Plaintiff's moderate limitations in concentration, persistence, or pace. The Seventh Circuit has found such a finding legally insufficient. *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009) ("The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to "simple" tasks, and we and our sister courts continue to reject the Commissioner's position."). Here, the ALJ's limitation to simple, routine work does not account for Plaintiff's difficulties in concentration. (R. 493, 499.) Nor does it account for Plaintiff's moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. (R. 497.) Accordingly, the ALJ's limitation to simple, routine work does not sufficiently address Plaintiff's deficiencies in these areas. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2008) (noting limitation to simple and repetitive work did not adequately account for limitations in concentration, persistence, or pace); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) (hypothetical limited to simple, unskilled work did not account for claimant's difficulties with memory, concentration or mood swings).

Plaintiff also asserts that the ALJ erred in her RFC assessment because the ALJ failed to consider the combined impact of her impairments, which included her depression, generalized anxiety and histrionic personality disorders, lumbar spondylosis, spine fracture at the L5 disc level, cerebral palsy, and chronic pseudoseizures. (Pl.'s Mem. at 14-15.) The Commissioner has not responded to this issue and, as Plaintiff correctly points out, the ALJ must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. The ALJ is required

to undertake this analysis because the combination of a claimant's impairments "might well be totally disabling" even if each of the claimant's impairments standing alone is not serious. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir.2011). Here, the ALJ's RFC analysis does not give this Court confidence that she gave appropriate consideration to the combined effects of Plaintiff's physical and mental impairments. The ALJ's failure to consider the full impact of Plaintiff's impairments is another reason why this case must be remanded for further proceedings. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir.2009).

Because the ALJ has not constructed an accurate and logical bridge between Plaintiff's impairments, supported by substantial evidence in the record, and the RFC assessment, a remand on this issue is warranted.[11] *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments . . . and may not dismiss a line of evidence contrary to the ruling."); *Getch v Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (an ALJ must provide a "logical bridge" between the evidence and her conclusions). Furthermore, given the complexity of the medical issues and the fact that there is not an adequate medical basis or opinion in the record for determining whether Plaintiff's mental and physical impairments are disabling, on remand, the ALJ should summon a medical expert to testify. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) ("No medical expert testified, although the procedure for adjudicating social security disability claims departs from the adversary

---

[11] In light of the ruling herein, the Court does not need to reach the remainder of Plaintiff's arguments pertaining to the ALJ's errors in the RFC finding. Specifically, the Court does not consider Plaintiff's contention that the ALJ erred when she failed to assess her moderate limitations in social functioning. (Pl.'s Mem. at 15-16.) Nor does the Court need to consider Plaintiff's assertion that the ALJ erred when she did not evaluate her limitations stemming from her hand tremors (e.g., fist locking and manipulative activities). *Id.* 19-21. The ALJ will necessarily revisit these issues in reassessing Plaintiff's RFC on remand.

model to the extent of requiring the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled.").[12]

**(3) *Credibility Issue***

Plaintiff contends the ALJ's credibility finding was flawed for a number of reasons. (Pl.'s Mem. at 16-19.) She primarily asserts that the ALJ improperly assessed the credibility of her testimony on basis of her own personal observations at the hearing and also found her testimony incredible because she had not received appropriate medical treatment. *Id.* The Commissioner defends the ALJ stating she properly considered the record evidence and gave little weight to Plaintiff's subjective complaints because there were no diagnostic tests indicating the presence of a disabling physical impairment, medical professionals noted Plaintiff had drug seeking behavior, Plaintiff was able to control her pseudoseizures, and she drove despite her claims of daily seizures. (Def.'s Mem. at 9-10.)

An ALJ's credibility finding will be afforded "considerable deference" and will be overturned only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted). "A credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). However, where the credibility determination is based on objective factors rather than subjective considerations, an ALJ is in no better position than the court and so the court has greater freedom to review it. *Craft*, 539 F.3d at 678. Therefore, where "the reasons given by the trier of fact do not build an accurate and logical bridge between the

---

[12] The ALJ's reliance on the state agency physicians' opinions was insufficient because the physicians did not adequately assess the limitations stemming from all of Plaintiff's impairments, including her pseudoseizures. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

evidence and the result," an ALJ's credibility determination will not be upheld. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The ALJ made a number of reversible errors in assessing the credibility of Plaintiff's testimony. The ALJ first improperly focused her credibility finding on her own personal observations of Plaintiff having a seizure at the hearing. For example, the ALJ did not believe Plaintiff was having a seizure because the ALJ observed that when Plaintiff "went into full upper body spasms," she "stayed nicely in her chair and did not bite her tongue." (R. 27.) When an ALJ's credibility determination is based on a personal observation that constitutes a medical determination, the observation cannot stand. *Thomas v. Sullivan*, 801 F.Supp. 65, 71-72 (N.D. Ill. 1992) (the "ALJ . . . overstepped his bounds when he relied on his personal observations of [the plaintiff]" and the ALJ's "reliance on personal observation was improper because nothing about [the plaintiff's] complaints conflicted with his appearance or conduct as described in the record—at least insofar as a layperson could make such an evaluation."); *Myles v. Astrue*, 582 F.3d, 672 677 (7th Cir. 2009) (an independent medical conclusion by an ALJ is improper). Furthermore, the ALJ's error was compounded by her limited visual capability that day because the hearing was conducted by video; thus, she relied on Plaintiff's attorney's descriptive narrative about Plaintiff's condition at the hearing and whether emergency medical assistance was needed when she had her seizure. (R. 42-43, 60-61.)

The ALJ next discredited Plaintiff's testimony because she "has not generally received the type of medical treatment one would expect from a totally disabled individual." (R. 25.) In assessing Plaintiff's medical treatment, the ALJ appears to have discredited the severity of Plaintiff's symptoms by reaching her own, unsupported medical conclusion without discussing what type of

28

treatment she believed would be appropriate.  *Myles*, 582 F.3d 677.  The ALJ also erred when she found Plaintiff's treatment had been successful in controlling her symptoms because she ignored evidence of Plaintiff frequent trips to hospital emergency rooms due to her pseudoseizure episodes. (R. 25.)  The ALJ again erred when she drew a negative inference from Plaintiff's failure to follow though on different treatment recommendations; such as, consulting a mental health expert because Plaintiff testified she could not afford medical treatment.  (R. 25, 45, 56.)  *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.").  Also, the ALJ's conclusion that Plaintiff's testimony was incredible because she sought emergency medical treatment to "generate evidence" for her disability application and appeal is speculative and lacks record support.  *White ex. rel Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999).  Furthermore, the ALJ's belief that Plaintiff did not have side effects from her medication is not supported by the record because, at times, she was nauseous and vomited from her medication.  (R. 45, 363-64.)

As a final point, the ALJ discredited Plaintiff's testimony because she engaged in malingering or misrepresentation of  her seizure symptoms, had a history of abusing medications and engaging in attention seeking behavior by embellishing or changing her stories, and was able to control her pseudoseizure activity.  (R. 26-27.)  But as detailed throughout this opinion, there is sufficient credible medical evidence that substantiates Plaintiff's shaking and pseudoseizure episodes.  Additionally, Plaintiff's attention seeking behavior may be connected to her histrionic personality disorder but the ALJ never explored this possibility. DSM-IV-TR at 117 ("The essential feature of histrionic personality disorder is pervasive and excessive emotionality and attention-

seeking behavior."). Accordingly, these remaining reasons do not constitute substantial evidence sufficient to support the ALJ's credibility finding.

Based on these shortcomings, this Court cannot uphold the ALJ's credibility determination. On remand, the ALJ must conduct a reevaluation of Plaintiff's testimony with due regard for the full range of medical evidence.

## CONCLUSION

For the foregoing reasons, the ALJ's decision and the Commissioner's subsequent denial of Plaintiff's DIB and SSI benefits are reversed, and this case is remanded with instructions to return the matter to the Social Security Administration for further proceedings consistent with this Opinion.

SO ORDERED on June 4, 2013.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE